1

2

3

4        UNITED STATES DISTRICT COURT

5        DISTRICT OF NEVADA

6   MICHAEL TODD SANZO,                    3:14-cv-00030-RCJ-WGC

7                        Plaintiff,        **REPORT & RECOMMENDATION OF**
                                           **U.S. MAGISTRATE JUDGE**
8        v.

9   JAMES G. COX, et. al.,

10                       Defendants.

11

12       This Report and Recommendation is made to the Honorable Robert C. Jones, United

13  States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

14  28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is

15  Defendants' Motion for Summary Judgment. (ECF No. 57.)[1] Plaintiff filed a response (ECF No.

16  61) and Defendants filed a reply (ECF No. 66).

17       After a thorough review, the court recommends that the motion be granted in part and

18  denied in part.

19                            **I. BACKGROUND**

20       Plaintiff was formerly an inmate at the Nevada Department of Corrections (NDOC).

21  (Pl.'s Third Am. Compl., ECF No. # 49.) He is represented by counsel, and brings this action

22  pursuant to 42 U.S.C. § 1983, concerning the alleged denial of dental care while he was housed

23  at High Desert State Prison (HDSP). (*Id*.)

24       Plaintiff initially filed his complaint on January 14, 2014, and then filed a motion to

25  amend on February 7, 2014. (ECF No. 3.) The court screened the amended complaint (ECF No.

26  7), and allowed Plaintiff to proceed with an Eighth Amendment deliberate indifference claim

27  based on his allegations that he requested medical/dental treatment for his six abscessed teeth

28  _____
        [1] Refers to court's electronic case filing (ECF) number.

and gums which were infected and swollen, affecting his ability to eat and sleep due to the pain. (Screening Order, ECF No. 6.) After failing to receive treatment, he attempted to resolve the problem himself by extracting three of his own teeth which resulted in more pain and blood loss. (*Id*.) After this, Plaintiff still did not receive any treatment and proceeded to extract more teeth. (*Id*.) He still did not receive attention from the prison staff at HDSP. (*Id*.)

Pursuant to a stipulation, Plaintiff filed his second amended complaint on March 3, 2015. (ECF No. 42.)

Defendant Flesher was dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m). (ECF No. 37.) On March 17, 2015, Defendants filed a suggestion of death as to defendant Sevier. (ECF No. 43.) The court subsequently approved the parties' stipulation to allow Plaintiff to file a third amended complaint, removing defendant Sevier from the case. (ECF No. 48.) The third amended complaint was filed on April 16, 2015. (ECF No. 49.) On May 18, 2015, the parties stipulated to the dismissal with prejudice of defendants Garner and Jones. (ECF No. 60.) Therefore, the remaining defendants are Collette Ball, Dr. Bruce Bannister, Giovanni Capra, James "Greg" Cox, and Joon Lee.

Defendants now move for summary judgment.

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go  beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

### III. DISCUSSION

**A. Deliberate Indifference Standard**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

1    A claim for deliberate indifference involves the examination of two elements: "the

2    seriousness of the prisoner's medical need and the nature of the defendant's response to that

3    need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX*

4    *Tech., Inc. v. Miller,* 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202,

5    1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious'

6    medical need exists if the failure to treat a prisoner's condition could result in further significant

7    injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing

8    *Estelle*, 429 U.S. at 104); *Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in

9    nature include "an injury that a reasonable doctor or patient would find important and worthy of

10   comment or treatment; the presence of a medical condition that significantly affects an

11   individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974

12   F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted)

13   (finding that inmate whose jaw was broken and mouth was wired shut for several months

14   demonstrated a serious medical need).

15        If the medical need is "serious," the plaintiff must show that the defendant acted with

16   deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation

17   omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,

18   1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or

19   even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action

20   under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present

21   when a prison official "knows of and disregards an excessive risk to inmate health or safety; the

22   official must both be aware of the facts from which the inference could be drawn that a

23   substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*,

24   511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

25        "Dental care is one of the most important medical needs of inmates." *Hunt v. Dental*

26   *Dept.*, 865 F.3d 198, 200 (9th Cir. 1989). Accordingly, the Eighth Amendment requires that

27   prisoners be provided with a system of ready access to adequate dental care. *Id*. (citing *Hoptowit*

28   *v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982)).

1    Defendants do not contest that Plaintiff's dental needs were serious; therefore, the court's

2    analysis will focus on whether Defendants were deliberately indifferent to those needs.

3    **B. Summary of Evidence**

4    On March 7, 2012, a medical report from an incident on the yard noted that Plaintiff had

5    loose bottom teeth. (ECF No. 58-1 at 2.) According to Plaintiff, he injured his teeth during a

6    basketball game that day. (ECF No. 61 at 4 ¶ 12; Pl.'s Depo. Trans., ECF No. 61-2, 15:9-13,

7    16:1-15.) Plaintiff was subsequently placed in administrative segregation at HDSP. (ECF No. 61

8    at 4 ¶ 12.) According to Plaintiff, the nurse who completed the report assured him they would

9    take care of his teeth. (*Id.* ¶ 13; Pl.'s Depo. Trans. ECF No. 61-2, 16:25, 17:1-6.) Plaintiff says

10   that he waited for this care, and then on July 7, 2012, he filed a kite requesting attention, stating

11   that his teeth were getting looser and that he could not eat. (Pl.'s Depo. Trans., ECF No. 61-2,

12   17:8-12.)[2]

13   In between March and July 2012, Plaintiff says he sent two or three kites to medical,

14   stating that he was in pain, needed aspirin, wanted to be on the priority list, and could not eat or

15   sleep. (Pl.'s Depo. Trans., ECF No. 61-2, 18:10-24.) He believes the first kite he sent was in

16   May. (Pl.'s Depo. Trans., ECF No. 61-2, 22:1-2.) He did not receive a response to these kites.

17   (Pl.'s Depo. Trans., ECF No. 61-2, 22:5-6.) Between March and July 2012, he was seen at sick

18   call for other reasons, but claims he showed the nurses his teeth and he asked what could be

19   done, and was told medical and dental were two separate departments. (Pl.'s Depo. Trans., ECF

20   No. 61-2, 18:25, 19:1-11.)

21   On July 31, 2012, Plaintiff sent a kite indicating that four of his bottom teeth were ready

22   to fall out, and he could barely eat and was in bad pain. (ECF No. 58-4 at 3.) He stated: "Please

23   hurry I need them pulled." (*Id.*) In response, he was told: "When your name comes up on the list

24   we'll see you." (*Id.*) Plaintiff maintains that this was signed by defendant Ball. (ECF No. 61

25   ¶ 17.) Ball states that the first grievance she responded to was dated August 7, 2012, but the

26   July 31, 2012 kite is signed by "CB" on August 2, 2012, and the "CB" initials look similar to

27

28   [2] Plaintiff's third amended complaint also refers to a kite being filed on July 7, 2012; however, the kite attached as an exhibit to the complaint is dated July 31, 2012. (ECF No. 49-1.) This is consistent with the evidence presented by Defendants. (*See* ECF No. 58-4 at 3.)

those on the other kites to which Ball responded. (*Compare* ECF No. 49-1 with ECF Nos. 49-2, 49-3, 49-5.)

On August 7, 2012, Plaintiff sent another kite stating: "I cannot stress to you the problem [with my] teeth-they are so so, so, so [loose]. I can't eat. I can't sleep. Do I have to call a man down? or emergency? Let me know- cause it's real bad." (ECF No. 58-4 at 4.) He received this response from defendant Ball: "There are still a few inmates ahead of you. we are working as fast as we are able. Call man down if you need to. Remember we have a lot of inmates in the same condition as you." (*Id.*).

Between August 9, 2012, and August 30, 2012, Plaintiff claims that his pain increased and his gums and teeth were abscessed, infected, swollen and throbbing with pain. (ECF No. 61 at 6 ¶ 19; Pl.'s Third Am. Compl., ECF No. 49 ¶ 20.)

On August 30, 2012, Plaintiff sent a kite stating: "I can't take this pain! Can you at least send me some IBUs or Aspirin. Please- This is an emergency- Please- the pain is sooo unbearable!" (ECF No. 58-4 at 5.) The pill call nurse on duty wrote on the top of the kite that Plaintiff's teeth could be pushed back and forth with very little pressure. (*Id.*) He received this response from defendant Ball on August 31, 2012: "When your name comes up on the list we'll see you. We are working as fast as we are able. We go in order of kites..." (*Id.*)

Plaintiff claims that he called a man-down on September 1, 2012. (Pl.'s Depo. Trans., ECF No. 61-2, 26:21-24-25.) He did not get a response, other than to be asked if he was dying. (*Id.*) Between September 1, 2012 and October 8, 2012, Plaintiff claims that his pain was so extreme that he could not sleep, had difficulty eating, lost his appetite, had feverish sweats, lost control over his bowel movements and contemplated suicide. (ECF No. 61 at 6 ¶ 23; Pl.'s Third Am. Compl., ECF No. 49 ¶ 23.)

On October 1, 2012, Plaintiff claims that he began to pull his teeth out by repeatedly punching himself on the side of his jaw. (ECF No. 61 at 6-7 ¶ 24; Pl.'s Sec. Am. Compl., ECF No. ¶ 25; Pl.'s Depo. Trans., ECF No. 61-2, 32:8-10, 34:5-13.) He was screaming and begging for aspirin. (Pl.'s Depo. Trans., ECF No. 61-2, 34:5-6.) There was blood everywhere. (Pl.'s Depo. Trans., ECF No. 61-2, 34:13.) Every officer that was on shift at that time came by and saw

him. (Pl.'s Depo. Trans., ECF No. 61-2, 35:16-20.) Getting the teeth out took about three days, where he punched himself in the face and banged against the sink and desk to get them loose. (Pl.'s Depo. Trans., ECF No. 61-2, 36:6-14.) During this process he threw up and soiled himself. (Pl.'s Depo. Trans., ECF No. 61-2, 36:15-18.) Capra told him to stop pulling out his teeth because it could kill him. (Pl.'s Third Am. Compl., ECF No. 49 ¶ 25.)

On October 4, 2012, Plaintiff's medical records reflect that he complained of dental pain. (ECF No. 58-3 at 3.) It was noted he should get a dental appointment and medication. (*Id.*)

From October 5, 2012 through October 9, 2012, Plaintiff claims he could not eat or sleep normally due to extreme pain and mental anguish. (Pl.'s Third Am. Compl., ECF No. 49 ¶ 26.)

On October 9, 2012, Plaintiff submitted an emergency grievance, stating that he had been trying since July 31, 2012, to get dental to see him regarding his two bottom teeth which he described as so loose they moved back and forth, and caused him great pain that resulted in an inability to eat or sleep. (ECF No. 57-10 at 2.) He reiterated that he had sent kites to dental and was told to be patient and wait his turn. (*Id.*) He had waited two months and was still in pain. (*Id.*) He reported that he had to pull some of his teeth out on his own. (*Id.*) The response from defendant Ball states that Plaintiff is in a segregation unit which is shared with three other units, and there are only three hour clinics, where the oldest kites are seen first. (*Id.*) He was advised to be patient, "as we are working as fast as we are able." (*Id.* at 4.) No one came to see him in response to the emergency grievance. (Pl.'s Third Am. Compl., ECF No. 49 ¶ 28.)

After this, he sat in extreme pain, and he talked to the officers about this every day. (Pl.'s Depo. Trans., ECF No. 61-2, 37:5-7, 13-14.) Between October 10 and 14, 2012, Plaintiff asserts that he begged for help from Lee and Capra, but they only brought his pleas to the pill call nurse who said she could not do anything because the medical and dental units were separate. (Pl.'s Third Am. Compl., ECF No. 49 ¶ 29.)

On October 14 or 15, Plaintiff tried to choke himself with a sheet. (Pl.'s Depo. Trans., ECF No. 61-2, 39:23-25, 28:1-8.) Capra saw him on the floor, shook his head, smiled and walked off. (Pl.'s Depo. Trans., ECF No. 61-2, 38:14-18.) Capra did not call a man-down. (Pl.'s Depo. Trans., ECF No. 61-2, 38:22-23.) Around October 15, 2012, he removed his other teeth.

(Pl.'s Depo. Trans., ECF No. 61-2, 39:7-9; Pl.'s Third Am. Compl., ECF No. 49 ¶ 30.) He started to punch himself, and hit the desk and sink, and slammed himself against his bunk. (Pl.'s Depo. Trans., ECF No. 61-2, 39:12-19, 24-25, 40:1-3.) He was screaming. (Pl.'s Depo. Trans., ECF No. 61-2, 39:18-19.) He vomited and soiled himself again. (Pl.'s Depo. Trans., ECF No. 61-2, 40:8-9.) Capra asked him if he was going to clean it up. (Pl.'s Depo. Trans., ECF No. 61-2, 40:20-22.)

On October 24, 2012, Plaintiff sent a kite, stating that dental had ignored his emergency grievance, and it had been three months and they did not have time to see him. (ECF No. 58-4 at 6.) He requested that they get him a medical transfer to NNCC to be helped. (*Id.*) He reported that he had to pull out six of his own teeth, punching himself in the mouth to get them loose. (*Id.*) He indicated that the pain was unbearable and he could not take it anymore, and pleaded for help. (*Id.*) He received this response from defendant Ball: "I didn't say because you['re] in Ad-Seg; that you are put on the last to help. What I said was that your unit moves slower due to each inmate needs to be escorted one at a time and alone. Instead of bringing up as a group which caused your unit to move more slowly along with sharing your units time slot with 3 other ad-seg units." (*Id.*)

On October 25, 2012, Plaintiff sent a kite stating that he had begged and pleaded for help, and filed an emergency grievance, only to be denied medical treatment for his teeth. (ECF No. 58-4 at 7.) He reported having many abscesses, causing him fever and vomiting, and pain. (*Id.*) He had to pull six of his own teeth because of the pain. (*Id.*) In response he was told by defendant Ball: "As I have explained before Mr. Sanzo you are in a lockdown unit. You are seen 1 at a time and share the slot with other lockdown units. We see everyone by order of their kite this being firm, fair and consistent. A great percentage of inmates are in the same condition as you are. I know having a toothache is very painful. However I can only see inmates by their units and their kites. There is no denying medical care, you are treated as everyone else. You need to look at the big picture. A lot of inmates here!." (*Id.*)

Plaintiff was transferred to ESP in November 2012. (Pl.'s Depo. Trans., ECF No. 61-2, p. 44:24.)

1    In November 2012, Plaintiff sent a kite stating that he had waited over three months at

2    HDSP to get his teeth pulled, with abscesses and pain. (ECF No. 58-4 at 8.) He indicated he had

3    filed an emergency grievance, and a man-down, only to be told no, wait your turn. (*Id*.) As a

4    result, he had to pull out six of his own teeth, punching himself to make them loose. (*Id*.) He

5    reported that he was still in pain, and had only one tooth left on the bottom that hurts. (*Id*.)

6    On November 7, 2012, it was noted that Plaintiff complained of pain in his lower canine.

7    (ECF No. 58-3 at 4.) He was prescribed an ibuprofen pain pack. (*Id*.)

8    On January 3, 2013, he sent a kite regarding tooth pain, and medications were sent until

9    Plaintiff could be seen. (ECF No. 58-3 at 4.)

10   On January 17, 2013, Plaintiff filed a grievance reporting unnecessary infliction of pain

11   by medical and dental staff, stating that he had been in pain for 248 days. (ECF No. 57-12 at 2.)

12   He references a failure to respond to a man-down on September 1, 2012. (*Id*.) He reported that as

13   a result of the failure to provide him with treatment, he was forced to smash out his own teeth.

14   (*Id*. at 3.) He indicates that medical and correctional staff witnessed the blood everywhere, and

15   some custody staff called medical but he was still not provided with treatment. (*Id*.)

16   D.A. Jones at ESP responded that the dentist at ESP stated that he did not see any recent

17   visible trauma to his mouth when he pulled Plaintiff's tooth. (ECF No. 57-12 at 7.) At the first

18   level, J. Garner responded: "It is unfortunate you had this difficulty where you were before. I am

19   glad you were able to get taken care of here at Ely. I hope your dental issues are now resolved as

20   reported by my dental department." (*Id*. at 13.) At the second level, Dr. Bannister responded that

21   he agreed with the first level response to the grievance. (*Id*. at 16.)

22   On March 1, 2013, Plaintiff was ordered a liquid diet due to not having any teeth. (ECF

23   No. 58-5 at 2.)

24   On March 13, 2013, Plaintiff was seen regarding his teeth. (ECF No. 58-3 at 4.) On

25   March 27, 2013, impressions were made. (*Id*.) He eventually got a full set of dentures at ESP.

26   Pl.'s Depo. Trans., ECF No. 61-2, 48:2-5.)

27   Plaintiff has submitted a declaration of his neighbor at HDSP, inmate Simon Morales.

28   (ECF No. 57-12 at 10-12; ECF No. 61-13 at 2-4.) Mr. Morales was aware of Plaintiff's dental

- 10 -

issues. (*Id.*) He notes that Plaintiff asked for help from Capra, Lee and the nurses. (*Id.*) When the pain became unbearable, Plaintiff started smashing his own teeth out, which everyone on the tier heard, even the correctional officers. (*Id.*) He has also heard Plaintiff yell "man-down" to the correctional officers working in the unit, and no attention was given to him. (*Id.*) He witnessed a correctional officer pick up Plaintiff's emergency grievance only to have it returned with no remedy. (*Id.*) He says it was plainly evident that Plaintiff had smashed out his own teeth, as his mouth was bleeding. (*Id.*) By September 2012, Plaintiff had lost around thirty pounds and continued to inform the correctional officers and nurses of his condition. (*Id.*)

Plaintiff also submitted the declaration of inmate Eric Smith. (ECF No. 61-14 at 2-4.) Mr. Smith lived upstairs and across from Plaintiff at HDSP, and was able to see into Plaintiff's cell. (*Id.*) He heard Plaintiff screaming in pain, and saw his face which was swollen from abscesses. (*Id.*) He confirms that the unit correctional officers were Flesher, Capra, Sevier and Lee. (*Id.*) He asserts that Plaintiff would go to his door with blood all over his mouth and shirt, screaming for help as he was forced to pull out his own teeth. (*Id.*) Mr. Smith claims that Plaintiff yelled "man-down" to the officers working in the unit numerous times, but no one responded. (*Id.*) He observed Plaintiff unable to eat his food, which resulted in weight loss. (*Id.*)

Defendants submitted additional evidence, including declarations of defendants Ball, Capra and Lee, the substance of which will be discussed in connection with the parties' arguments below.

**B. Lee and Capra**

**1. Summary of Argument**

Defendants assert that Plaintiff alleges that between October 10, 2012 and October 14, 2012, Plaintiff begged for help from Lee and Capra, but they only brought his pleas to the pill call nurse who said she could not do anything because the medical and dental units were separate. (ECF No. 57 at 9, citing Pl.'s Sec. Am. Compl., ECF No. 49 at 5.) They contend that there is no evidence to support that Lee or Capra delayed, denied or interfered with Plaintiff's requests for dental treatment. (*Id.*)

1    According to Lee, on October 9, 2012, he was working in HDSP Unit C/D, and

2    responded to Plaintiff's cell regarding an emergency grievance. (ECF No. 57 at 9; Lee Decl.,

3    ECF No. 57-13 ¶ 4.) Plaintiff complained his teeth were falling out and showed Lee by shaking

4    one of his teeth. (ECF No. 57 at 9; Lee Decl., ECF No. 57-13 ¶ 5.) Plaintiff appeared upset that

5    he was not getting medical attention, but did not seem to be in pain. (*Id.*) Lee took the grievance

6    to the dental office in the infirmary and one of the nurses read and signed it. (ECF No. 57 at 9;

7    Lee Decl., ECF No. 57-13 ¶ 6.) Lee told the nurse one of Plaintiff's teeth was shaking and

8    looked like it was about to come out. (*Id.*) The nurse said the dental office was very busy and

9    many inmates were on the waiting list. (*Id.*) Lee returned the grievance to Plaintiff, and after

10   Plaintiff signed it, Lee placed it in the grievance box. (ECF No. 57 at 9; Lee Decl., ECF No. 57-

11   13 ¶ 7.) Lee did not witness Plaintiff pulling his teeth out, screaming in pain, covered in blood,

12   vomiting or losing control of his bowels. (ECF No. 57 at 9; Lee Decl., ECF No. 57-13 ¶ 8.)

13   Plaintiff did not request a man down, and Lee did not see signs that would necessitate calling a

14   man down for him. (*Id.*)

15   Capra claims he did not witness Plaintiff attempting to pull out his teeth and did not hear

16   him yelling for help. (ECF No. 57 at 10; Capra Decl., ECF No. 57-14 ¶ 5.) Plaintiff did complain

17   of pain and occasionally asked to see medical, and Capra always called the medical department

18   to inform them of the request. (*Id.*) A nurse came to the cell as a result of Capra calling and

19   Plaintiff was given medication. (*Id.*) Capra did not see Plaintiff with blood all over his mouth and

20   shirt, and did not see him in his own vomit or feces. (ECF No. 57 at 10; Capra Decl., ECF No.

21   57-14 ¶ 6.) Plaintiff did not call a man-down during Capra's shifts, and Capra never had to call a

22   man-down for him. (ECF No. 57 at 10; Capra Decl., ECF No. 57-14 ¶ 6.)

23   Defendants maintain that it is protocol for custody staff to contact medical when there is

24   a complaint of an urgent problem. (ECF No. 57 at 10; Defs.' Ex. H, ECF No. 57-9 at 2.) Medical

25   staff is then charged with ensuring a timely assessment of the patient. (ECF No. 57 at 10; Defs.'

26   Ex. H, ECF No. 57-9 at 3.) Capra and Lee are correctional officers and claim they followed

27   protocol by reporting Plaintiff's complaints to dental and nursing staff. (*Id.*)

28

- 12 -

According to Plaintiff he asked Capra to call the dentist, and showed him his teeth. (Pl.'s Depo. Trans., ECF No. 61-2, p. 20:7-13.) Capra, walking away, would say: "all you got to do is call man down and they will bring you to the hospital." (Pl.'s Depo. Trans., ECF No. 61-2, p. 20:13-15.) Capra told him to show the nurse, but they did not do anything. (Pl.'s Depo. Trans., ECF No. 61-2, p. 20:20-24.) Capra would ask Plaintiff how many teeth he pulled out. (Pl.'s Depo. Trans., ECF No. 61-2, p. 77:25, 78:1-7.)

He maintains that he told Lee and Capra about his dental condition every day they worked. (Pl.'s Depo. Trans., ECF No. 61-2, p. 24:3-5, 24:14-21.) He showed them, and spit out blood in the shower. (Pl.'s Depo. Trans., ECF No. 61-2, p. 24:23-25.) He said he had abscesses that were the size of half of a golf ball. (Pl.'s Depo. Trans., ECF No. 61-2, p. 24:25, 25:1.)

He claims that Lee could have brought the nurses to see his condition, and report his screaming, vomiting and soiling himself. (Pl.'s Depo. Trans., ECF No. 61-2, p. 80:10-15.) Lee told him he couldn't help him, because he did not want any problems. (Pl.'s Depo. Trans., ECF No. 61-2, p.90:2-18.) He maintains that Lee and Capra saw him pulling out his teeth. (Pl.'s Depo. Trans., ECF No. 61-2, p. 92:7-25, 93:1-4, 93:7-11.)

Plaintiff asserts that he begged Lee and Capra for help; Capra saw Plaintiff try to commit suicide; Lee admitted that he tried to file an emergency grievance for Plaintiff and that Plaintiff's teeth were falling out but does not indicate he took the emergency grievance to a supervisor so that Plaintiff could be evaluated; Capra admits that Plaintiff complained of pain and asked to see medical staff; Plaintiff called a man-down in their presence; Capra told Plaintiff to stop pulling his teeth because it could kill him. (ECF No. 61 at 15 ¶ 49.) Plaintiff argues that Capra and Lee knew about Plaintiff's serious dental issues, that they posed a serious risk of harm to Plaintiff, and that Plaintiff was in excruciating pain, but failed to bring these issues to a supervisor or higher official within NDOC who could have taken corrective measures. (*Id*. at 15-16 ¶ 51.) Capra and Lee could have called a man-down for Plaintiff to assure he received emergency treatment. (*Id*.) They could have responded to Plaintiff's man-down calls. (*Id*.)

In their reply, Lee and Capra argue that Plaintiff's sentiment that they could have done more is insufficient to demonstrate deliberate indifference. (ECF No. 66 at 2-3.) They assert that

1  they did not ignore Plaintiff's complaints. Capra brought kites to medical and brought nurses to

2  Plaintiff's cell. (*Id*. at 3.) Lee brought Plaintiff's requests to the attention of the pill call nurse.

3  (*Id*.) Lee took an emergency grievance to medical and told the nurse about Plaintiff's teeth. (*Id*.)

4  They argue that even if Plaintiff did yell "man-down," this is not enough to show Lee and

5  Capra were deliberately indifferent. (*Id*. at 3-4.) They claim there is no evidence that this put Lee

6  and Capra on notice of an urgent problem. (*Id*. at 4.) They reiterate that they had no control over

7  the treatment or scheduling of appointments by medical or dental. (*Id*.)

8  **2. Analysis**

9  The court finds that there is a genuine dispute of material fact as to whether Lee and

10  Capra were deliberately indifferent to Plaintiff's serious dental needs. While it is undisputed that

11  Lee took Plaintiff's emergency grievance to the dental department on October 9, 2012, and that

12  Capra had reported some Plaintiff's complaints to pill call nurses, there is a dispute as to whether

13  there were other instances where Lee and Capra had knowledge of Plaintiff's serious dental

14  condition, yet failed to act. Lee and Capra maintain that they never heard Plaintiff call a man-

15  down or viewed an instance that would have necessitated calling a man-down for Plaintiff.

16  Plaintiff, on the other hand, insists that he called a man-down on September 1, 2012, and they

17  did not respond.

18  In addition, Plaintiff claims that Lee and Capra saw him reeling in pain, pulling out his

19  own teeth, covered in blood, screaming in agony, and did nothing.  Plaintiff specifically testified

20  that Capra saw him pulling out his teeth, and told him to stop doing it because it could kill him,

21  but took no other action. In addition, he contends that Capra saw him when he was attempting to

22  commit suicide, and just smiled, shook his head and walked off, but did not call a man-down. He

23  asserts that Capra saw him on the second occasion he pulled his teeth out, when he had vomited

24  and soiled himself, and Capra asked him whether he was going to clean it up, but took no other

25  action. In light of this factual dispute, summary judgment should be denied as to Lee and Capra.

26  ///

27  ///

28  ///

- 14 -

**C. Ball**

      **1. Summary of Argument**

        Collette Ball was a dental assistant at HDSP in 2012, and responded to Plaintiff's kites regarding his teeth. (ECF No. 57 at 11; Defs.' Ex. E, ECF No. 58-4; Ball Decl., ECF No. 57-7 ¶¶ 1, 4.) Ball told Plaintiff dental was working as fast as it could and Plaintiff would be seen and to call a man-down if needed. (ECF No. 57 at 11; Ball Decl., ECF No. 57-7 ¶ 6.) In 2012, Plaintiff was in a lockdown segregation unit and shared appointment times with three other units. (ECF No. 57 at 11; Ball Decl., ECF No. 57-7 ¶ 4.) Dental clinics were only scheduled on certain days and only for three hours per day. (ECF No. 57 at 11; Ball Decl., ECF No. 57-7 ¶ 4.) Dental appointments were scheduled according to the date a kite was received, with the older kites being seen first. (ECF No. 57 at 11; Ball Decl., ECF No. 57-7 ¶ 5.)

        Medical staff could report signs of swelling or an infection and request that the inmate be seen on a priority basis. (ECF No. 57 at 11; Ball Decl., ECF No. 57-7 ¶ 7.) Ball does not recall seeing a notation or request from medical that Plaintiff had an infection requiring priority treatment. (Ball Decl., ECF No. 57-7 ¶ 7.) When a nurse visited Plaintiff's cell and noted that four of his bottom teeth were loose, she did not write that his teeth were also infected, nor did she order a priority appointment. (ECF No. 57 at 11.) On October 4, 2012, medical staff stated Plaintiff complained of dental pain but made no notations regarding swelling or infection, or complaints of an abscess or infection. (*Id.*) Ball relied on medical staff to report infection or swelling because dental staff do not go down to the units to see inmates. (ECF No. 57 at 11; Ball Decl., ECF No. 57-7 ¶ 8.) She points out that Plaintiff never called a man-down. (ECF No. 57 at 12; Ball Decl., ECF No. 57-7 ¶ 6.)

        Ball states Dr. Shannon Sena, who was the institutional dentist at ESP and treated Plaintiff in November 2012, stated that a kite like Plaintiff's would not necessarily indicate that he needed a priority appointment. (ECF No. 57 at 12; Sena Transcript, ECF No. 57-15 at 5-6.) Dr. Sena confirmed that dental relies on medical to check inmates to see if there is visible swelling or infection so dental would need to see a patient sooner. (*Id.*)

1    Dr. Sena also testified that if an emergency grievance like the one Plaintiff filed was

2 received, the doctor would pull the medical chart to see what had been done, and send

3 medications if the patient could not be seen right away. (ECF No. 61 at 13 ¶ 46.) If a grievance

4 had been filed, the doctor would discuss it with the sergeant, medical staff or even the wardens to

5 decide if the patient should be prioritized and brought in sooner. (*Id.*) Most of the time, in

6 Dr. Sean's experience, this would all be done by the dental assistant.  (*Id.*)

7    Plaintiff contends that any time he would ask medical about his dental needs, they would

8 say they could not help him, because they were a separate department from dental. (Pl.'s Depo.

9 Trans., ECF No. 61-2, p. 88:9-24.)

10    Plaintiff asserts that in the emergency grievance of October 9, 2015, Plaintiff referenced

11 that he had pulled out his own teeth. (ECF No. 61 at 16 ¶ 53.) He argues that if Ball had

12 responded to the grievance by having Plaintiff seen, it could have avoided Plaintiff pulling out

13 the other teeth on October 15. (*Id.*)

14    Plaintiff disputes that Ball had no control over giving priority to one inmate over another.

15 (ECF No. 61 at 16 ¶ 54.) In her declaration, she states that medical staff who noticed swelling or

16 infection could make a priority request, and presumably that request would be made to Ball as

17 the dental assistant at HDSP who was responding to Plaintiff's complaints. (*Id.*) Plaintiff

18 maintains that Ball certainly could have had a supervisor or medical staff evaluate Plaintiff, but

19 she chose to ignore him. (*Id.*) Ball did not alert anyone that Plaintiff was in excruciating pain and

20 was extracting his own teeth. (ECF No. 61 at 17 ¶ 55.) NDOC AR 740.10(1) states that when an

21 emergency grievance is received by a staff member, it "shall be immediately delivered to the

22 shift supervisor no later than is reasonable and necessary to prevent serious injury or a breach of

23 security." (*Id.*) Ball admits the emergency grievance was not signed by the shift supervisor. (ECF

24 No. 61 at 18 ¶ 56; ECF No. 61-5 at 7.)

25    In response to Defendants' argument that Ball did not know of a risk of serious harm to

26 Plaintiff because medical staff did not state that infection or swelling was present, Plaintiff

27 asserts that none of the medical records indicate the absence of swelling or infection, and

28 Plaintiff's description of his pain indicate he was experiencing infection and swelling. (ECF No.

1  61 at 18 ¶ 57.) Nor is there any evidence that Ball sent someone to verify Plaintiff's assertions of

2  pain and self-extraction. (*Id*.)

3      In her reply, Defendants argue that Ball did not have the power to prioritize Plaintiff's

4  care. (ECF No. 66 at 5.) The reply asserts Plaintiff has not provided any evidence to the contrary.

5  (*Id*.)

6      Regarding the emergency grievance, Defendants claim that it was signed by Correctional

7  Officer Sevier, who should have taken it to his supervisor for review and signature, but he took it

8  to the dental department where it was reviewed by Ball. (*Id*. at 6.) She was required to determine

9  whether it was an emergency or not. (*Id*.; Ex. O, ECF No. 66-1.)[3]

10     **2. Analysis**

11     Ball claims that she acted appropriately in response to Plaintiff's dental complaints by

12 alerting him of the dental system at HDSP and telling him he would have to wait his turn given

13 that the units shared dental clinic time. She claims that she was not on notice that Plaintiff had a

14 serious risk to his health because there was never any notation by medical that he had swelling or

15 infection, and Plaintiff never called a man down.

16     The court finds that in response, Plaintiff has produced evidence to create a genuine

17 dispute of material fact as to whether Ball was deliberately indifferent to his serious dental needs.

18 Ball disputes that she received Plaintiff's initial kite dated July 31, 2012, but Ball admittedly

19 received several kites from Plaintiff in August 2012, complaining of loose teeth, causing him

20 pain and affecting his ability to sleep. On October 9, 2012, Ball received Plaintiff's emergency

21 grievance from Officer Sevier, which put her on notice that Plaintiff was suffering from extreme

22 pain, could barely eat, and the pain got so bad that he had to pull out some of his teeth on his

23 own. In response, defendant Ball did not go to evaluate Plaintiff. She did not send medical to

24 evaluate Plaintiff to investigate his claims. She did not alert a supervisor to his claims. Instead,

25

26    [3] AR 740, provides that an emergency grievance received by a staff member "shall be immediately
   delivered to the shift supervisor no later than is reasonable and necessary to prevent serious injury or a breach of
27 security." (ECF No. 66-1 at 11.) "The shift supervisor may confer with the on duty medical staff, Warden or
   Associate Warden and, if necessary, the DDs, to determine whether the grievance constitutes an emergency." (*Id*.)
28 "The highest-ranking staff member on duty, with the aid of an authorized Department official, shall immediately
   take any corrective measures necessary to prevent a substantial risk of injury or breach of security." (*Id*.)

she told him that the dental process in his unit was very slow, but the procedure was firm, fair and consistent. On October 24, 2012, Ball received another kite, where Plaintiff asked for a medical transfer to NNCC, reporting that he had to pull out six of his own teeth by punching himself in the mouth. He indicated again that the pain was unbearable. Again, Ball did not go to evaluate Plaintiff, send anyone to evaluate Plaintiff, or alert a supervisor about his complaints. She informed him, once again, that the dental process in his unit moves slowly. In his October 25, 2012 kite, Plaintiff mentioned that he had pleaded for help, and referenced abscesses which caused him to have a fever and vomiting and to pull six of his own teeth due to the unbearable pain. Plaintiff still received no evaluation and no dental treatment. Ball told Plaintiff again that the process is slow, that he should "look at the big picture," and that there are a lot of inmates.

In sum, Plaintiff has presented evidence that Ball was put on notice through the kites and emergency grievance that Plaintiff was suffering in unbearable pain, had difficulty eating and sleeping, he had self-extracted six of his own teeth by punching himself in the mouth, that he had abscesses which caused fever and vomiting, and she did nothing but tell him, in essence, to wait his turn. This is evidence that Ball knew of a serious risk to Plaintiff's health and blatantly disregarded that risk. As a result, Ball's motion for summary judgment must be denied.

**D. Bannister and Cox**

       **1. Summary of Argument**

Defendants argue that Plaintiff has not alleged that Bannister had any personal involvement in the alleged denial of dental treatment beyond the denial of his grievance, which was filed in January 2013, well after he pulled his own teeth and after he had received treatment at ESP. (ECF No. 57 at 12-13.) He had no knowledge or personal involvement with Plaintiff's dental care while he was at HDSP. (*Id*. at 13.)

Plaintiff argues that Dr. Bannister is liable based on a supervisory liability theory. (ECF No. 61 at 19.) Dr. Bannister was NDOC's medical director during the relevant time period. (ECF No. 61 at 19 ¶ 61.) Under AR 631.01(B)(1), the medical director is required to supervise and evaluate the clinical work of dentists at NDOC's prisons.

1   Defendant Cox argues that Plaintiff cannot demonstrate a supervisory liability claim on

2   behalf of Cox. (ECF No. 57 at 13-14.) Cox was the director of NDOC, and none of the

3   grievances, kites or requests were answered by him. (*Id*. at 14.) Nor is there evidence he had

4   knowledge of any of Plaintiff's claims (*Id*.)

5   Plaintiff testified he never personally saw Cox while incarcerated at HDSP. (Pl.'s Depo.

6   Trans., ECF No. 61-2, p. 69:9-12.) He claims he wrote Cox a letter. (Pl.'s Depo. Trans., ECF No.

7   61-2, p. 69:13-15.) He did not have it with him. (Pl.'s Depo. Trans., ECF No. 61-2, p. 69:17-19.)

8   He believes he sent the letter to Cox after he transferred to ESP. (Pl.'s Depo. Trans., ECF No.

9   61-2, p. 69:20-22.) He acknowledges that Cox was probably not aware of his dental claims. (Pl.'s

10   Depo. Trans., ECF No. 61-2, p. 70:19-21.)

11   Plaintiff argues that Cox was the head of NDOC during the relevant time period. (ECF

12   No. 61 at 19 ¶ 61.)

13   Plaintiff asserts that it is clear that the failure to provide Plaintiff with adequate medical

14   care arose in part from limitations placed on NDOC employees by Bannister and Cox, and their

15   failure to provide ready, reasonable access to adequate dental care at HDSP. (ECF No. 61 at 20 ¶

16   62.) Defendant Ball states that dental clinics were only scheduled for three hours on certain days,

17   limiting the number of patients that could be seen. (*Id*.) When Plaintiff brought his complaints to

18   NDOC medical staff, he would be told that medical and dental were two separate departments

19   and that the medical staff at HDSP could not help him. (*Id*.) In addition, it can be inferred that

20   there was an unreasonable delay in seeing the dentist at HDSP, and an inmate would have to

21   declare an emergency by calling a man-down in order to receive care in a reasonable amount of

22   time. (ECF No. 61 at 20-21 ¶ 63.)

23   In their reply, Defendants assert that Plaintiff did not grieve his dental issue until after he

24   had transferred to ESP. (ECF No. 66 at 8.) He did not submit correspondence or kites to Cox or

25   Bannister. (*Id*.) He did not meet with them regarding his claims he was being denied dental

26   treatment, and there is no evidence that they had any knowledge of the alleged violations by their

27   subordinates. (*Id*.)

28

1    They argue that Plaintiff's opposition seeks to change his theory of liability against Cox

2    and Bannister. (*Id.*) In his Third Amended Complaint, he alleges Cox is responsible for

3    establishing and supervising the inmate grievance process. (ECF No. 49 at 7.) He now claims

4    Bannister and Cox failed to provide Plaintiff with a system of ready access to adequate dental

5    care.

6         **2. Analysis**

7         "Under section 1983, supervisory officials are not liable for actions of subordinates on

8    any theory of vicarious liability." *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989).

9    Instead, a supervisor is liable only if: (1) he or she is personally involved in the alleged

10   constitutional deprivation, or (2) there is "sufficient causal connection between the supervisor's

11   wrongful conduct and the constitutional violation." *Id*. at 646.

12        The causal connection can include: "1) [the supervisor's] own culpable action or inaction

13   in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional

14   deprivation of which a complaint is made; or 3) conduct that showed a reckless or callous

15   indifference to the rights of others. *Lemire v. Cal. Dep't of Corr.*, 726 F.3d 1062, 1085 (9th Cir.

16   2013) (citations and internal quotation marks omitted). In addition, "[s]upervisory liability exists

17   even without overt personal participation in the offensive act if supervisory officials implement a

18   policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the

19   moving force of a constitutional violation.'" *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir.

20   2013 (quoting *Hansen*, 885 F.2d at 646).

21        The only allegations in the Third Amended Complaint relative to Dr. Bannister are that

22   he responded to and denied Plaintiff's second level grievance (ECF No. 49 ¶ 47), which Plaintiff

23   admits was after he had already been transferred to ESP and received appropriate dental care.

24   Plaintiff did not allege as a theory of liability against Dr. Bannister that he implemented a policy

25   concerning the provision of dental care within NDOC that resulted in the denial of dental care to

26   Plaintiff.

27        The only allegation pertaining to Cox in the Third Amended Complaint is that pursuant to

28   AR 740, Cox, as NDOC's Director, is responsible for establishing and supervising the inmate

1   grievance process that is to provide an appropriate and substantial response to an inmate's claim.

2   (ECF No. 49 ¶ 48.) He alleges that Cox knew of Plaintiff's dental situation through the grievance

3   process. (*Id.* ¶ 49.) There is no evidence in the record that Cox had actual knowledge of

4   Plaintiff's dental situation, or that he responded to any grievances submitted by Plaintiff.  Nor

5   did Plaintiff allege that Cox implemented a policy or policies within NDOC that resulted in the

6   denial of dental care to Plaintiff.

7          As a result, summary judgment should be granted as to Dr. Bannister and Cox.

8   **F. Qualified Immunity**

9          "Qualified immunity shields federal and state officials from money damages unless a

10   plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and

11   (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v.*

12   *al-Kidd*, 131 S.Ct.  2074, 2080 (2011) (quoting *Harlow v.  Fitzgerald*, 457 U.S. 800, 818

13   (1982)); *see also Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013) (citation omitted)

14   ("Qualified immunity protects government officials from civil damages 'insofar as their conduct

15   does not violate clearly established statutory or constitutional rights of which a reasonable person

16   would have known.*");Padilla v.  Yoo*, 678 F.3d 748, 758 (9th Cir.  2012); *Pearson v.  Callahan*,

17   555 U.S. 223 (2009). "Qualified immunity balances two important interests—the need to hold

18   public officials accountable when they exercise power irresponsibly and the need to shield

19   officials from harassment, distraction, and liability when they perform their duties reasonably."

20   *Pearson*, 555 U.S. at 231.

21          First, as detailed above, taking the facts in the light most favorable to Plaintiff, there is

22   evidence that Lee, Capra and Ball violated Plaintiff's Eighth Amendment rights. According to

23   Plaintiff, Lee and Capra saw Plaintiff in agonizing pain, pulling out his own teeth, covered in

24   blood, and did not respond to his man-down calls. Capra told him to stop pulling out his teeth,

25   but did nothing further. Capra then saw him attempting suicide, and shrugged it off. When he

26   saw Plaintiff pulling out his teeth again, when Plaintiff had vomited and soiled himself, Capra

27   asked him if he was going to clean it up, but took no other action. Ball was put on notice that

28   Plaintiff was suffering in extreme pain, unable to eat and had difficulty sleeping, was forced to

1   self-extract his own teeth by punching himself in the face, had abscesses which caused fever and

2   vomiting, and in response she repeatedly told Plaintiff the system was slow and he had to wait

3   his turn.

4        Second, Plaintiff's rights under the Eighth Amendment were clearly established at the

5   time the challenged conduct occurred. Courts have long recognized that prison officials may not

6   be deliberately indifferent to an inmate's serious medical needs, *Estelle v. Gamble*, 429 U.S. 97

7   (1976), and that "[d]ental care is one of the most important medical needs of inmates," *Hunt v.*

8   *Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (internal citation and quotation marks omitted),

9   and prison officials' acts that "deny, delay, or intentionally interfere with medical treatment," *id*.

10  at 201 (internal citation and quotation marks omitted), may constitute deliberate indifference. In

11  addition, "[p]rison officials show deliberate indifference to serious medical needs of prisoners if

12  prisoners are unable to make their medical problems known to medical staff." *Id*. at 200 (quoting

13  *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (internal quotation marks omitted).

14  Therefore, Lee, Capra and Ball are not entitled to qualified immunity.

15                              **IV. RECOMMENDATION**

16        **IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING**

17  Defendants' motion for summary judgment (ECF No. 57) as to defendants Cox and

18  Dr. Bannister, and **DENYING** Defendants' motion for summary judgment as to defendants Lee,

19  Capra and Ball.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    The parties should be aware of the following:

2    1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

3    this Report and Recommendation within fourteen days of receipt. These objections should be

4    titled "Objections to Magistrate Judge's Report and Recommendation" and should be

5    accompanied by points and authorities for consideration by the district judge.

6    2. That this Report and Recommendation is not an appealable order and that any notice of

7    appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

8    until entry of judgment by the district court.

9

10   DATED: December 10, 2015.

11   _____
     WILLIAM G. COBB
12   UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28